**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 18-4940

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

  v.

SHELDON MYERS,

    Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Robert G. Doumar, Senior District Judge.  (2:18-cr-00095-RGD-DEM-1)

Submitted:  December 11, 2020      Decided:  January 26, 2021

Before NIEMEYER and AGEE, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Agee and Senior Judge Traxler joined.

Geremy C. Kamens, Federal Public Defender, Caroline S. Platt, Appellate Attorney, Alexandria, Virginia, Suzanne V. Katchmar, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellant.  G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, Darryl J. Mitchell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

When a law enforcement officer finds illegal drugs in an automobile that the officer has legally stopped and searched and none of the occupants claim ownership of the drugs, it is "entirely reasonable" for the officer to infer that all the automobile's occupants are in a common enterprise and therefore to arrest them on probable cause that they are committing a crime. *Maryland v. Pringle*, 540 U.S. 366, 373 (2003).

In this case, Sheldon Myers, a passenger in an automobile that was legally stopped and searched, argues that officers, who found over 300 grams of fentanyl in the vehicle, did not have "particularized" probable cause to arrest him because the officers had no information that he, as distinct from the driver, owned the fentanyl. He seeks to distinguish *Pringle* on the basis that the driver here admitted to owning a loaded gun and three cell phones that were also found in the vehicle. Myers argues that because guns and drugs go together, the driver was the more likely suspect. As he reasons, "the police knew the gun belonged to the driver . . . but still decided that they had probable cause that the fentanyl belonged to [him, Myers]." Thus, he concludes, the officers did not have probable cause particularized to him, but only a "hunch," which does not support a legal arrest.

We conclude, however, that Myers focuses too narrowly on the ownership of the fentanyl. While it is true that the officers did not have any information as to who owned the fentanyl, they did see a distributable amount of it lying on the floorboard of the automobile behind the passenger seat and reasonably believed that, in the absence of any claim to owning it, Myers and the driver were in a *common enterprise* that involved possession of the fentanyl. Such circumstances, *Pringle* holds, are sufficient to support

2

particularized probable cause that the two were committing a crime. We thus confirm the legality of Myers's arrest.

I

In its efforts to stem the flow of drugs into Norfolk, Virginia, the drug interdiction unit of the Norfolk Police Department, headed by Sgt. William Winingear, regularly surveilled bus stations, the train station, the airport, hotels, motels, parcel facilities, and the highway.

On February 1, 2018, Sgt. Winingear was surveilling a parking lot bus station located next to a strip mall from where the New Everyday Bus Company operated an inexpensive bus service between Norfolk and Chinatown, New York City, known locally as "the China bus." In the past, the China bus had been used to further drug distribution from New York City, and the interdiction unit had previously made drug seizures at that location.

At 11:30 p.m. on February 1, a China bus arrived at the bus stop, and Sgt. Winingear saw 20 to 30 passengers exit, including Myers. Myers stuck out as he had no bag, backpack, or luggage — as might be expected for the distance from New York — but was carrying only a "dark" unidentifiable "object" in his hand. Sgt. Winingear observed Myers walk around the front of the bus, look around, and then make a call on a cell phone. Minutes later, a silver Infiniti two-door sedan arrived, and Myers got into the passenger seat. Sgt. Winingear's suspicion of Myers prompted him to "notif[y] the guys [in his unit] to start observing." He also told Officer William Gibson of his concern, telling him that

the silver Infiniti contained "a possible person of interest" and instructed him to follow the vehicle "[t]o see if they could obtain probable cause so that [they] could stop the vehicle" and ask some questions.

As Officer Gibson — along with Officer Donald Todd — began to follow the silver Infiniti, Gibson noted that the vehicle's windows may have been excessively tinted, in violation of Virginia law. He followed the Infiniti as it passed two 7-Eleven convenience stores and then turned into a third 7-Eleven. After stopping at that 7-Eleven for a "short time," the Infiniti retraced its route back to where the bus had stopped and then, by a circuitous, if not illogical, route entered Interstate 264, passing up one access to the westbound lanes and then taking another. Officer Gibson found the vehicle's overall course to be "suspicious," suggesting that its occupants might have known that they were being followed. After the vehicle entered the interstate, Gibson clocked its speed, and, both because it was speeding and because he believed that the windows were unlawfully tinted, he stopped the vehicle. As Gibson approached the driver's side, he smelled marijuana, as did Officer Todd when approaching the passenger side. Based on that smell, the officers searched the vehicle and its occupants — the driver and Myers.

The search uncovered a "blue Honey Maid graham cracker box on the floorboard behind the front passenger seat." The box was partially obscured by the seat, and because the automobile was a two-door sedan, the officers had to move the seat forward to see the entire box. The box contained a brick-like substance in a vacuum-sealed plastic bag, which field tested positive for fentanyl. Laboratory testing confirmed that preliminary test and found that the package contained over 300 grams. The search also uncovered three cell

4

phones, one in the driver's seat and two in the glove box, and a loaded 9mm pistol in the trunk. The driver claimed ownership of those four items. A search of Myers recovered another cell phone and approximately $1,800 in cash. Neither of the automobile's occupants, however, claimed ownership of the drugs. A test of the Infiniti's windows confirmed that they were excessively tinted — Virginia law prohibits tinting that screens over 50% of the light, and the Infiniti's windows blocked 83%. Both Myers and the driver were arrested based on the fentanyl.

After Myers was indicted for conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846, he filed a motion to suppress evidence, challenging the automobile stop and search, as well as his arrest on the ground that the officers lacked probable cause that Myers had committed a crime. The district court denied the motion, and Myers pleaded guilty pursuant to a plea agreement, reserving his right to challenge on appeal the court's ruling on his motion to suppress. The district court then sentenced Myers to 75 months' imprisonment. This appeal followed, challenging only the sufficiency of the evidence to establish probable cause for Myers's arrest.

II

On appeal, Myers does not challenge the traffic stop for speeding and excessive tinting or the subsequent search based on the smell of marijuana. He challenges only his arrest, which was based on what the officers uncovered during the search.

5

Myers contends in essence that the officers did not have sufficient knowledge to reasonably believe that he, as distinct from the driver, had anything to do with the fentanyl and therefore that the officers lacked probable cause to arrest him for its possession. Noting correctly that the officers' belief of his guilt had to be "particularized" as to him, *see Pringle*, 540 U.S. at 371, he argues that because the driver admitted to ownership of the gun discovered in the automobile's trunk and three of the cell phones and because "drugs and guns all too often go hand in hand" (quoting *United States v. Lomax*, 293 F.3d 701, 706 (4th Cir. 2002)), the officers could have acted only on a "hunch" in arresting him.

Myers's argument is a familiar one, as drug crimes are frequently uncovered after automobiles with multiple occupants are stopped for traffic violations. His argument therefore merits a careful discussion of the principles governing arrests in such circumstances.

The grounding principle flows from the Fourth Amendment, which prohibits unreasonable seizures. Fleshing out that proscription, the Supreme Court has held that, to be reasonable, an arrest of an individual must be supported by probable cause to believe that the individual has committed or is committing a crime. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *United States v. Watson*, 423 U.S. 411, 423–24 (1976). The Court has recognized that probable cause is a generalized concept that can be given useful meaning only in context. This is because "it deals with probabilities and depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371. But generally, "probable cause" is characterized as "a reasonable ground for belief of guilt . . . particularized with respect to the person" being arrested. *Id.* (cleaned up). In that vein, we have noted that the

6

probable-cause inquiry "does not involve the application of a precise legal formula or test but the commonsense and streetwise assessment of the factual circumstances." *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004); *see also Pringle*, 540 U.S. at 370 (describing probable cause as a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life" (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (cleaned up)). Thus, in determining whether an arrest was justified by probable cause, we take account of all the relevant facts known to the arresting officer and "the inferences [that may be] drawn by [the officer] on the scene," including the "officer's practical experience and the inferences the officer may draw from that experience." *Humphries*, 372 F.3d at 657.

In this case, the facts learned by the officers and the inferences that they could draw in light of their practical experience — 21 years as to Sgt. Winingear and 16 years as to Officer Gibson — began with the surveillance of the bus stop in Norfolk. At the time of arrest, the officers thus knew that:

- The bus stop, which served ongoing bus service between Norfolk and New York, functioned as an entry point for drugs, as the officers had often seized drugs there on previous occasions.

- At 11:30 p.m. on February 1, Myers exited the China bus, carrying no luggage, backpack, or bag but only a "dark object." And after Myers looked around, he made a cell phone call and was soon picked up by a silver Infiniti sedan. This conduct at that time and place caused Sgt. Winingear, based on his practical experience, to become suspicious.

7

- The silver Infiniti traveled an unusually circuitous route, suggesting to the officers following the vehicle that the occupants knew that they were being followed.

- When the automobile was stopped for speeding and excessively tinted windows, the officers smelled marijuana coming from the inside of the automobile.

- A search yielded a loaded gun, four cell phones, over 300 grams of fentanyl, and approximately $1,800 in cash. The driver admitted to owning the gun and three cell phones, and the other cell phone and the $1,800 in cash was found on Myers's person. But neither occupant claimed ownership of the fentanyl, which was found lying on the floorboard behind the passenger seat.

Answering the obvious question of what the two occupants of the silver Infiniti were up to, a reasonable officer could conclude (1) that a crime was being committed in his presence, i.e., possession of fentanyl, and (2) that the two occupants were involved in a common enterprise. The two occupants surely knew each other or had a preexisting arrangement with each other, as the Infiniti picked Myers up shortly following his call and there was no indication of a ride-sharing arrangement. The two were present in a vehicle that smelled of marijuana that had apparently been smoked. The two made a trip to a specific 7-Eleven store and both were aware of the route the vehicle pursued thereafter. And neither of the two provided information about ownership of the fentanyl, which was "readily accessible" to both.

Thus, this is not a case where "mere propinquity to others independently suspected of criminal activity" is advanced as the basis for probable cause, such as was the case of a customer frequenting a bar being searched by law enforcement for drugs, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), or where one individual present in an automobile with the defendant has been "single[d] out" as the guilty person, effectively exculpating the defendant, *United States v. Di Re*, 332 U.S. 581, 594 (1948). Here, no singling out occurred, as both the driver and Myers failed to provide officers any information about the ownership of the fentanyl. Moreover, the contextual facts revealed clearly that Myers and the driver knew each other, or at least had a preexisting arrangement, and that they proceeded in concinnity with knowledge of each other's actions. Thus, these circumstances match more closely those in *Pringle*.

In *Pringle*, the officer stopped an automobile for speeding during the early morning hours, and the vehicle he stopped had three occupants. 540 U.S. at 367–68. Following a consensual search of the vehicle, the officer found $763 and five glassine baggies of cocaine "from between the back-seat armrest and the back seat." *Id.* at 368. When all three occupants denied ownership of the cocaine and money, the officer arrested all three, and the Supreme Court held that the officer had probable cause to do so because he could reasonably infer a common enterprise among the occupants. *Id.* at 368, 374. It reached that conclusion because

> a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing. Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a

9

dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

*Id*. at 373 (cleaned up).

Despite the similarity of *Pringle*, Myers nonetheless maintains that the facts here of criminal conduct were not shown to be particularized to him, and, in any event, he seeks to distinguish *Pringle* because here the driver admitted ownership of the gun and cell phones. But his arguments miss the significance of *Pringle*'s holding. Because the three occupants in *Pringle* denied ownership of drugs that were found in the automobile, the officer was justified in inferring that all three were involved in illegal conduct, justifying their arrest. While the role of each occupant was not known to the officer, he well could conclude that the community of conduct suggested by the circumstances *particularized the suspicion as to all three* and thus justified their arrest. The same is true for Myers and the driver of the silver Infiniti, in which the fentanyl was found.

We conclude that the district court properly ruled that the Norfolk police officers had probable cause to arrest Myers — as well as the driver — and affirm the judgment of the district court.

AFFIRMED

10