**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3399
_____

MICHELE OWEN BLACK,
                                        Appellant

v.

MONTGOMERY COUNTY; DET. JOHN T. FALLON;
LOWER MERION TOWNSHIP; DET. GREGORY
HENRY; BRYAN GARNER; CHIEF FIRE OFF. CHARLES
MCGARVEY; DEPUTY FIRE MARSHALL FRANK
HAND; STATE TROOPER ROBERT POMPONIO
_____

Appeal from the United States District Court for the Eastern
District of Pennsylvania
(E.D. Pa. No. 2-14-cv-06702)
District Judge:  Honorable Anita B. Brody
_____

Argued on June 8, 2016
Before:  CHAGARES, KRAUSE, and SCIRICA, <u>Circuit
Judges</u>

(Filed: August 30, 2016)


Michael C. Schwartz          [ARGUED]
James, Schwartz & Associates
1500 Walnut Street
21st Floor
Philadelphia, PA 19102
        *Counsel for Appellant*

Carol A. Vanderwoude      [ARGUED]
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street
18th Floor
Suite 2300
Philadelphia, PA 19103
        *Counsel for Appellees Township of Lower Merion,
        Detective Gregory Henry, Bryan A. Garner, Chief Fire
        Off. Charles McGarvey and Deputy Fire Marshal
        Frank Hand*

Philip W. Newcomer        [ARGUED]
Montgomery County
Solicitor's Office
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404-0311
        *Counsel for Appellees Montgomery County and
        Detective John T. Fallon*

Claudia M. Tesoro   [ARGUED]
John G. Knorr, III
Office of the Attorney General
21 South 12th Street
Third Floor
Philadelphia, PA 19107
        *Counsel for Appellee State Trooper Robert Pomponio*

_____

OPINION
_____

CHAGARES, Circuit Judge.

Plaintiff Michele Black filed a lawsuit under 42 U.S.C. § 1983 and state law alleging that various police and fire officials, as well as a county and township, violated her constitutional rights in connection with criminal proceedings against her. The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) and the District Court granted these motions.

2

Two issues are now before us on appeal from the order granting the motions to dismiss. The first issue is whether the District Court erred in determining that Black was not "seized" as required for a Fourth Amendment malicious prosecution claim. The second issue is whether the District Court erred in finding that Black's Fourteenth Amendment due process claim for fabricated evidence required that she be convicted at trial, since she was acquitted. We hold that the answer is yes for both issues. Accordingly, we will vacate the District Court's order and remand for further proceedings.

I.[1]

On November 21, 2012, a fire broke out at the home where Black had grown up in Lower Merion Township, Montgomery County, Pennsylvania. Black's mother had sold the home two days before. Originally, the closing date was set for November 30, 2012, but it was moved up so the buyers could upgrade the wiring before they moved in. The buyers could not obtain homeowner's insurance unless the old wiring was upgraded because it was viewed as a fire hazard. Black's mother entered into a post-settlement possession addendum which allowed her to remove her possessions from the home while the buyer's contractors upgraded the wiring.

The fire broke out in the third floor of the home. Black was in the home helping her mother remove possessions,[2] while the buyer's electricians were upgrading the wiring. The fire resulted in a "V" pattern of fire damage extending from a 220-volt electrical outlet. The electricians extinguished the fire before they called the fire department. After arriving at the home, the Gladwyne Fire Chief called the dispatcher to report an electrical fire.

---

[1] These facts come from Black's Second Amended Complaint and are construed in the light most favorable to her. See Leamer v. Fauver, 288 F.3d 532, 535 (3d Cir. 2002).
[2] The fact that Black was in the home when the fire occurred does not appear to be specifically alleged in the complaint. But both parties state it in their briefs, Black Br. 3; Montgomery County Br. 3, and it is implied by subsequent events.

3

Defendant Deputy Fire Marshal Frank Hand and his supervisor defendant Chief Fire Officer Charles McGarvey arrived at the scene. Hand was not an electrical expert, but he disassembled the electrical outlet where the fire had started. Hand could not determine that the fire was accidental, so he called the District Attorney's Office and the state police for help. Hand concluded that the fire was intentionally started and was not an electrical fire. Despite fire damage on the electrical outlet, Hand did not preserve the outlet, supporting brackets, electrical box, or the outlet cover. Hand intentionally misrepresented his findings that the wire to the outlet had been cut 18 inches from the outlet to support the proposition that there was no power source for the outlet. His supervisor, defendant McGarvey, witnessed the fire scene and assisted Hand with his investigation.

Defendant State Trooper Thomas Pomponio, an alternate deputy fire marshal, arrived at the scene. After he learned that the wire had already been cut, Pomponio concluded the fire was caused by an open flame, ruling out that the outlet caused the fire. Pomponio did not inspect the electrical panel in the basement as he normally would because he heard that it had already been inspected. Had he done so, he would have discovered that the fire was an electrical one.

Defendant John Fallon, a certified fire inspector, arrived at the home, examined the outlet and concluded the damage was caused by an open flame, not by the electrical outlet. Fallon determined that the outlet was not energized when the fire occurred. In arriving at his conclusion, Fallon relied on the word of one of the electricians, rather than personally inspecting the panel box in the basement as required by protocol.

A box of matches was found on another windowsill in the room where the fire started, and Fallon, Pomponio, and Hand assumed these matches were used to start the fire, despite evidence that this was an electrical fire. These three defendants never tested the box of matches for DNA or fingerprints, or analyzed whether the match strike pad had been used.

4

Shortly after the fire broke out, Fallon, Pomponio, Hand, as well as defendant Detectives Gregory Henry and Bryan Garner, first questioned the electricians. Black "was advised that she was not free to leave the premises until she was questioned by police, and was escorted by police to and from the bathroom." Appendix ("App.") A41. These defendants did not check the veracity of the electricians' story. During the interrogation of Black, the officers immediately accused Black of setting the fire. Black also alleges that at the end of her interrogation, Fallon told her that if she did not surrender herself to them at a later date, a warrant would be issued for her arrest, the defendants would have her hometown District Attorney's Office in California send a police officer to arrest her, she would remain in custody until extradited, and remain in jail until her arraignment.

Black alleges that Fallon made several material falsehoods and omissions in an affidavit of probable cause to arrest her. These falsehoods and omissions included: failing to report that the fire started at an electrical outlet; failing to mention that the Gladwyne Fire Chief first reported an electrical fire; failing to mention that electricians were at the scene to fix the wiring; failing to mention that the circuit panel was never checked in the basement; and failing to mention that the outlet and live wires were never tested.

Black returned home to California after the fire. On December 17, 2012, Pennsylvania authorities issued an arrest warrant for Black for arson endangering persons, risking catastrophe, criminal mischief, and recklessly endangering another person. Black flew to Pennsylvania on December 18, 2012 for her arraignment. She was arraigned and was released on $50,000 unsecured bail.[3] A condition of her bail was that Black was required to appear at all subsequent

_____

[3] Release on unsecured bail bond means "[r]elease conditioned upon the defendant's written agreement to be liable for a fixed sum of money if he or she fails to appear as required or fails to comply with the conditions of the bail bond. No money or other form of security is deposited." Pa. R. Crim. P. 524(C)(3).

5

proceedings. Black was then required to be fingerprinted and photographed at a police station, which took over an hour.

Black again returned to her home in California. On January 24, 2013, Black flew from California to Pennsylvania to attend her preliminary hearing. She flew from California to Pennsylvania for twelve out of fourteen pre-trial conferences because the Court Notices for each conference said that if she did not appear a bench warrant would be issued for her arrest.

Prior to trial, Black retained a fire expert, John J. Lentini, who concluded that the fire was unequivocally an electrical one, not an arson. Lentini reached out to Hand to discuss his findings and to review the photographs of the fire with Hand. Lentini never received a response from Hand. Black's counsel emailed the assistant district attorney assigned to the case to advise him about Lentini's findings and to offer to meet the prosecutor and his expert. The assistant district attorney never responded to this offer.

On April 23, 2014, Black's trial began. Fallon and Hand offered evidence at trial that the outlet was not energized and that the wire was cut. Photographs offered by Black, however, taken the day of the fire show the wire was intact. The photographs offered and explained by Fallon and Hand appear to have been taken later. Black presented evidence that the defendants fabricated and suppressed exculpatory evidence. On April 24, 2014, she was found not guilty of all charges. The jury deliberated for less than forty minutes.

Subsequently, Black filed this lawsuit on November 21, 2014. She filed the Second Amended Complaint on June 11, 2015. Black named as defendants Montgomery County, Detective John T. Fallon, Lower Merion Township, Detective Gregory Henry, Detective Bryan Garner, Chief Fire Officer Charles McGarvey, Deputy Fire Marshall Frank Hand, and State Trooper Robert Pomponio. The complaint was brought pursuant to 42 U.S.C. § 1983 and alleged, inter alia, malicious prosecution in violation of the Fourth Amendment, violation of her Fourteenth Amendment due process rights due to fabrication, suppression, and destruction of evidence,

6

conspiracy claims under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), against the defendant government entities, and various state law claims.

The defendants filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). On September 21, 2015, the District Court granted the motions to dismiss all of the federal claims and declined jurisdiction over the remaining state law claims. In particular, the District Court dismissed Black's malicious prosecution claim because it determined Black never experienced the types of liberty restrictions that constitute a Fourth Amendment seizure. Next, the District Court determined that the Fourteenth Amendment due process claim for fabricated evidence could not succeed because our decision in <u>Halsey v. Pfeiffer</u>, 750 F.3d 273 (3d Cir. 2014), requires a conviction for such a claim, and Black was acquitted at trial. Finally, the District Court dismissed the conspiracy and <u>Monell</u> claims because Black could not succeed on the underlying malicious prosecution or due process claims. Black filed a timely appeal.

II.[4]

Our review of the granting of a motion to dismiss under Rule 12(b)(6) is plenary. <u>McGovern v. City of Phila.</u>, 554 F.3d 114, 115 (3d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). We must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quotation marks omitted).

---

[4] The District Court had federal question jurisdiction over the section 1983 claims pursuant to 28 U.S.C. § 1331, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

7

III.

A plaintiff seeking relief under 42 U.S.C. § 1983 must demonstrate "that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). Accordingly, section 1983 is not a source of substantive rights but rather a mechanism to vindicate rights afforded by the Constitution or a federal statute. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). Black argues that the District Court erred in dismissing her Fourth Amendment malicious prosecution claim and her Fourteenth Amendment procedural due process claim for fabrication of evidence. We agree.

A.

To prove a Fourth Amendment malicious prosecution claim, a plaintiff must show: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007) (emphasis added). Black challenges the District Court's dismissal of her Fourth Amendment malicious prosecution claim based on its determination that she was not "seized" by the defendants.

1.

The Fourth Amendment to the Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court in Terry v. Ohio, forged a general definition of the meaning of seizure: "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." 392 U.S. 1, 19 n.16 (1968). The restraint by an officer must be "through means intentionally applied" as opposed to an unknowing act. Brower v. Cty. of Inyo, 489 U.S. 593, 597 (1989). A

8

traditional arrest by an officer is a commonly understood type of seizure. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) ("An arrest, of course, qualifies as a 'seizure' of a 'person' . . . ."). But the scope of what may be considered a seizure is broader than this common example and the Supreme Court has supplied some helpful guidance as to the parameters of the term. See generally Terry, 392 U.S. at 16 ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime . . . .").

An actual physical touching is not required to constitute a seizure of a person, but in the absence of a physical touching, there must be a submission to an officer's show of authority. California v. Hodari D., 499 U.S. 621, 626 (1991). As a corollary, the deprivation or restraint of a person's liberty may be physical, or it may be that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980) (plurality). Cf. Brendlin v. California, 551 U.S. 249, 255 (2007) ("[T]he 'coercive effect of the encounter' can be measured . . . by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" (quoting Florida v. Bostick, 501 U.S. 429, 435-36 (1991)). So, while an officer merely asking a citizen questions may not be a seizure, circumstances indicating a seizure might include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554 (plurality); see, e.g., Brendlin, 551 U.S. at 255 ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief." (quotation makes omitted)); Brower, 489 U.S. at 598 (noting that officers' use of a roadblock to stop petitioner's car constituted a seizure of the petitioner and explaining "a roadblock is not just a significant show of authority to induce a voluntary stop, but [it] is designed to produce a stop by physical impact if voluntary compliance does not occur"); Mendenhall, 446 U.S. at 555 (plurality) (holding that no

9

seizure occurred when agents approached a person to ask questions in a public place, and the agents identified themselves but did not display weapons, did not place demands upon the person, and were not wearing uniforms); Terry, 392 U.S. at 19 ("In this case there can be no question, then, that Officer McFadden 'seized' petitioner . . . when he took hold of him and patted down the outer surfaces of his clothing.").

In Albright v. Oliver, a plurality of the Supreme Court concluded that a party essentially claiming an officer maliciously prosecuted him cannot rely upon a substantive due process theory and held specifically that "it is the Fourth Amendment, and not substantive due process, under which petitioner Albright's claim must be judged." 510 U.S. 266, 271 (1994). Although the Court posited that Albright's "surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment," id., the Court did not rule upon whether Albright's claim would succeed under the Fourth Amendment because he failed to raise the issue, id. at 275.[5]

Justice Ginsburg wrote a concurrence in Albright discussing the meaning of seizure and, in particular, what we have termed a "continuing seizure." See, e.g., Schneyder v. Smith, 653 F.3d 313, 319 (3d Cir. 2011); DiBella v. Borough of Beachwood, 407 F.3d 599, 602 (3d Cir. 2005). Justice Ginsburg first noted that consideration of the common law may assist today's understanding of what constitutes a Fourth Amendment seizure. Albright, 510 U.S. at 277 (Ginsburg, J., concurring). She acknowledged that, "[a]t common law, an arrested person's seizure was deemed to continue even after

---

[5] We have recognized that the lack of a decision on the merits of a Fourth Amendment claim in Albright "as well as the splintered views on the constitutional implications of malicious prosecution claims expressed in the various concurrences, has created great uncertainty in the law." Gallo v. City of Phila., 161 F.3d 217, 222 (3d Cir. 1998) (citing Taylor v. Meacham, 82 F.3d 1556, 1561 n.5 (10th Cir. 1996) (noting that "Albright muddied the waters rather than clarified them"); Reed v. City of Chi., 77 F.3d 1049, 1053 (7th Cir. 1996) (alluding to the "Albright minefield")).

10

release from official custody." Id. at 277-78. Noting that the common law purposes of arrest and other means such as bail are to compel a person to appear in court, Justice Ginsburg recognized that "[t]he common law thus seems to have regarded the difference between pretrial incarceration and other ways to secure a defendant's court attendance as a distinction between methods of retaining control over a defendant's person, not one between seizure and its opposite." Id. at 278. Justice Ginsberg determined that this concept of seizure comports with "common sense" as well as "common understanding," and explained:

> A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

> A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

Id. at 278-79.

We have described the analysis in Justice Ginsburg's Albright concurrence as "compelling and supported by

11

Supreme Court case law,"[6] <u>Gallo v. City of Phila.</u>, 161 F.3d 217, 223 (3d Cir. 1998), and have expressly adopted her concept of "continuing seizure," <u>Schneyder</u>, 653 F.3d at 319. Further, we have explained that under this view, "[p]re-trial restrictions of liberty aimed at securing a suspect's court attendance are all 'seizures' . . . [because] the difference between detention in jail, release on bond, and release subject to compliance with other conditions is in the <u>degree</u> of restriction on the individual's liberty, not in the <u>kind</u> of restriction." <u>Id.</u> at 320.

We subsequently applied Justice Ginsburg's analysis to determine whether a person was seized for Fourth Amendment purposes. In <u>Gallo v. City of Philadelphia</u>, we held that a plaintiff seeking section 1983 relief for violation of his Fourth Amendment rights was seized post-indictment because he had to post a $10,000 bond, attend court hearings including his trial and arraignment, contact Pretrial Services on a weekly basis, and was prohibited from travelling outside of two states, New Jersey and Pennsylvania. 161 F.3d at 222. Noting that we had adopted "a broad approach in considering what constitutes a seizure," <u>id.</u> at 224, we concluded "that the combination of restrictions imposed upon Gallo, because they intentionally limited his liberty, constituted a seizure," <u>id.</u> at 225.

In contrast, in <u>DiBella v. Borough of Beachwood</u>, we held that the plaintiffs were not seized when "only issued a summons; they were never arrested; they never posted bail; they were free to travel; and they did not have to report to Pretrial Services." 407 F.3d at 603. We noted that unlike the "significant pretrial restrictions"[7] imposed in <u>Gallo</u>, the

---

[6] For instance, we have noted that in <u>Justices of Boston Municipal Court v. Lyon</u>, 466 U.S. 294, 300-01 (1984), the Supreme Court held that release on personal recognizance falls within the definition of "in custody" under the federal habeas corpus statute, and have reasoned that this holding "is relevant given that both seizure and custody concern governmental restriction of the freedom of those suspected of crime." <u>Gallo</u>, 161 F.3d at 223.

[7] We reiterate here that "[w]e hold open the possibility that some conditions of pre-trial release may be so insignificant as

plaintiffs' liberty in DiBella was restricted only during their municipal court trial and that merely attending trial does amount to a seizure for Fourth Amendment purposes. Id. We further explained that "[p]retrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure." Id.

2.

Turning to the facts alleged in this case and applying pertinent case law, we conclude that Black was seized for Fourth Amendment purposes. Black, insofar as she was charged with arson and other crimes, meets Justice Ginsburg's threshold of "[a] person facing serious criminal charges." Albright, 510 U.S. at 278 (Ginsburg, J., concurring). Black's liberty was subject to constitutionally significant restraints by the defendants, according to the complaint.

Less than one month after being interrogated by police and accused of committing arson,[8] Black flew from her home in California to Pennsylvania for her arraignment because an arrest warrant had been issued and she had been directed to return. See Gallo, 161 F.3d at 223 ("When he was obliged to go to court and answer the charges against him, Gallo, like the plaintiff in Terry, was brought to a stop. . . . [I]t is difficult to distinguish this kind of halt from the exercise of authority deemed to be a seizure in Terry."). She spent more than an hour being fingerprinted and photographed at a police station — and she was clearly not free to leave. See Mendenhall, 446 U.S. at 554 (plurality). Black was required to post unsecured bail of $50,000. She was told that the bond would be forfeited if she did not attend all court proceedings — compelling her to travel across the United States to attend pre-trial hearings. Even though Black was never incarcerated, that "should not lead to the conclusion that a

_____

to not implicate constitutionally protected liberty interests." Schneyder, 653 F.3d at 321 n.12.

[8] We note that after Black was interrogated, Fallon warned Black that if she did not surrender at a later date she would be arrested in California, remain in custody until extradited, and remain in jail until arraignment.

13

defendant released pretrial is not still 'seized' in the constitutionally relevant sense." Albright, 510 U.S. at 279 (Ginsburg, J., concurring). Further, the cloud of very serious charges demonstrates that Black was "hardly freed from the state's control upon [her] release from a police officer's physical grip." Id. at 278.

The defendants seek to distinguish this case from other similar cases by pointing out that the Pennsylvania state court handling Black's criminal proceedings did not impose a formal limitation on her travel. However, in Gallo, we determined that the plaintiff's "liberty was restrained through travel restrictions and mandatory court appearances." 161 F.3d at 225 (emphasis added); see also id. at 224-25 ("[C]onstraints on Gallo's freedom were not limited to restrictions on his travel, he was also compelled to attend all court hearings."). Accordingly, it is significant that Black was required to fly from California to Pennsylvania for twelve pre-trial conferences in just a year "to appear in court at the state's command." Albright, 510 U.S. at 278 (Ginsburg, J., concurring); see Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013) ("We have consistently held that a post-arraignment defendant who is 'obligated to appear in court in connection with [criminal] charges whenever his attendance [i]s required' suffers a Fourth Amendment deprivation of liberty." (quoting Murphy v. Lynn, 118 F.3d 938, 946 (2d Cir. 1997)). Black was forced to travel this great distance — presumably at great expense — a dozen times to defend herself. This demonstrates that Black was "scarcely at liberty; [s]he remain[ed] apprehended, arrested in [her] movements, indeed 'seized' for trial, so long as [s]he [was] bound to appear in court and answer the state's charges." Albright, 510 U.S. at 279 (Ginsburg, J., concurring). In contrast to Gallo and DiBella, Black did not live in the jurisdiction where she was tried and if she did not travel, she faced serious charges and a possibility of incarceration. Further, Black's life was presumably disrupted by the compulsion that she travel out of state a dozen times. See generally id. at 278 ("Pending prosecution, [her] employment prospects may be diminished severely, [s]he may suffer reputational harm, and [s]he will experience the financial and emotional strain of preparing a defense."). Black's circumstances demonstrate that she experienced

14

"constitutionally significant restrictions on [her] freedom of movement for the purpose of obtaining h[er] presence at a judicial proceeding" and she was "seized within the meaning of the Fourth Amendment." Schneyder, 653 F.3d at 321-22.

Considering the totality of the circumstances alleged, Black has sufficiently alleged that her liberty was intentionally restrained by the defendants. Accordingly, we will vacate the District Court's determination that she was not seized as is required for a Fourth Amendment malicious prosecution claim.

B.

We next consider Black's Fourteenth Amendment due process claim for fabrication of evidence. Black has alleged that defendants Fallon and Hand conspired with the other defendants and deliberately fabricated, suppressed, and destroyed evidence from the inception of their investigation through the trial of the criminal case against her. Relying on our opinion in Halsey v. Pfeiffer, the District Court ruled that Black's Fourteenth Amendment due process claim for fabricated evidence must fail because Halsey requires a conviction for such a claim, and she was acquitted at trial.

The legal question before us is whether a plaintiff may pursue a fabricated evidence[9] claim against state actors under the due process clause of the Fourteenth Amendment even if the plaintiff was never convicted. While we held in Halsey that a fabricated evidence claim could proceed when a plaintiff was convicted at trial, we explicitly left open the question of whether such a claim would be viable if a plaintiff was acquitted. Consistent with other Courts of Appeals that have considered this question, as well as our reasoning in Halsey, we now hold that such a stand-alone fabrication of evidence claim can proceed if there is no conviction.

---

[9] We acknowledge that Black has alleged a variety of wrongful acts including fabrication, suppression, and destruction of evidence. For the ease of reference, we will refer to her allegations collectively as fabrication of evidence.

15

We begin our analysis by examining our decision in Halsey. Much of our discussion in that decision centered upon which constitutional right was implicated by a fabricated evidence claim and, ultimately, whether there could be a stand-alone claim for fabrication of evidence. 750 F.3d at 288-96. The defendants rightly conceded that fabrication of evidence would deny a defendant due process of law,[10] but they argued that a plaintiff could only seek redress through a Fourth Amendment malicious prosecution action, as "the two claims are intertwined and . . . the former [a due process claim] can only exist as a portion of the latter [a Fourth Amendment malicious prosecution claim]." Id. at 290. The plaintiff countered that the Fourteenth Amendment due process clause protects the right to be free from evidence that is fabricated by state actors and is independent of a Fourth Amendment malicious prosecution claim. Id. at 290-91. Viewing both types of claims, we recognized that not all of the plaintiff's allegations may "fall under the traditional definition of a Fourth Amendment malicious prosecution claim." Id. at 292. Further, we observed the untenable possibility "that there would not be a redressable constitutional violation when a state actor used fabricated evidence in a criminal proceeding if the plaintiff suing the actor could not prove the elements of a malicious prosecution case, such as the lack of probable cause for the prosecution." Id. We also observed that "[w]hen falsified evidence is used as a basis to initiate the prosecution of a defendant, or is used to convict him, the defendant has been injured regardless of whether the totality of the evidence, excluding the fabricated evidence, would have given the state actor a probable cause defense in a malicious prosecution action that a defendant later brought against him." Id. at 289. As a result, we rejected the defendants' argument that claims of evidence fabrication must be tied to malicious prosecution cases. Id. at

---

[10] Indeed, we observed that "[t]o the best of our knowledge, every court of appeals that has considered the question of whether a state actor has violated [a] defendant's right to due process of law by fabricating evidence to charge or convict the defendant has answered the question in the affirmative. See Whitlock v. Brueggemann, 682 F.3d 567, 585 (7th Cir. 2012) (collecting court of appeals cases)." Halsey, 750 F.3d at 292.

292.[11] We supported this view by noting "that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence." Id. at 292-93.

Addressing the issue presented in Halsey we held, accordingly, that "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." Id. at 294. Nonetheless, we explicitly left open the question we face today. Id. at 294 n.19 ("Nor do we decide whether a defendant acquitted at a trial where fabricated evidence has been used against him has an actionable section 1983 claim." (emphasis added)). The defendants seem to argue, inter alia, that because we cautioned that courts in our circuit should not use the Halsey decision "beyond the scope of our holding," id. at 295, we have already foreclosed the question.

We see no reason to require a conviction as a prerequisite to a stand-alone due process claim against a state actor for fabrication of evidence. The harm we were concerned with in Halsey — corruption of the trial process — occurs whether or not one is convicted. It would be indeed anomalous if an attentive jury correctly saw through fabricated evidence, and its acquittal categorically barred later

_____

[11] Noting that the boundary between the Fourteenth and Fourth Amendments "is, at its core, temporal," we observed in Halsey that the Fourth Amendment's protection against unlawful seizure extends until trial whereas the due process of law guarantee "is not so limited as it protects defendants during an entire criminal proceeding through and after trial." Id. at 291. We determined, however, drawing a precise line between claims invoking the two rights was unnecessary in Halsey (as in the present case) because the fabrication of evidence allegedly infected the entirety of the criminal proceeding, from securing the indictment through trial. Id.; see also id. ("Wherever the boundary between the Fourth and Fourteenth Amendment claims lies, it is in the rear view mirror by the end of trial, when Fourth Amendment rights no longer are implicated.").

17

relief to the criminal defendant. Such a result would insulate the ineffective fabricator of evidence while holding accountable only the skillful fabricator. Fabricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for "corruption of the truth-seeking function of the trial process." United States v. Agurs, 427 U.S. 97, 104 (1976); see Napue v. People of Ill., 360 U.S. 264, 269 (1959) (acknowledging the principle that state actors "may not knowingly use false evidence . . . [is] implicit in any concept of ordered liberty"). The Supreme Court has explained that section 1983 is intended "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). A contrary holding would contravene the purposes of section 1983. There is no meaningful reason why due process protections precluding fabricated evidence should turn on whether or not one is convicted at trial.

Our reasoning in Halsey makes no distinction between fabricated evidence leading to a wrongful conviction and wrongful criminal charges. For example, we repeatedly referred to the injury of falsified evidence leading to wrongful initiation of prosecution. See, e.g., 750 F.3d at 289 ("When falsified evidence is used as a basis to initiate the prosecution of a defendant, or is used to convict him, the defendant has been injured . . . ." (emphasis added)); id. at 294 n.19 ("[I]f fabricated evidence is used as a basis for a criminal charge that would not have been filed without its use the defendant certainly has suffered an injury."). Furthermore, when we explained in Halsey why the injury violated due process, we focused on the corruption of the trial process. See id. at 293 ("[W]e think it self-evident that a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." (quotation marks omitted and emphasis added)). It is challenging to square away Halsey's broad language about "law and fundamental justice," id., with a requirement that one be convicted for a fabricated evidence claim to be viable; the harm of the fabrication is corrupting regardless of the outcome at trial or the particular time in the proceeding that the corruption occurs. We stressed in Halsey

18

that we were not suggesting that "there is nothing wrong with the fabricating of evidence if it does not affect the final verdict." Id. at 295 n.20.

Others Courts of Appeals have permitted plaintiffs to pursue due process claims predicated on the fabrication of evidence notwithstanding the fact, as here, that the plaintiff was not convicted of criminal charges. See, e.g., Cole v. Carson, 802 F.3d 752 (5th Cir. 2015); Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313 (11th Cir. 2015); Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123 (2d Cir. 1997). For instance, in Cole, the Court of Appeals for the Fifth Circuit recognized "a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person." 802 F.3d at 771. The court noted that deliberate framing by officials "offends the most strongly held values of our nation." Id. at 772. Accordingly, the court determined that "even when a trial functions properly to vindicate a person's innocence," fabrication of evidence deprives a person of his or her due process rights. Id. at 767. The court "held that a victim of intentional fabrication of evidence by officials is denied due process when he is either convicted or acquitted." Id. at 768 (emphasis added); see also id. ("[A] conviction [is] a requirement we have not insisted upon.").[12]

---

[12] Two Courts of Appeals appear to require a conviction as a prerequisite to a stand-alone due process claim. See Saunders-El v. Rohde, 778 F.3d 556, 562 (7th Cir. 2015) ("[A] police officer does not violate an acquitted defendant's due process rights when he fabricates evidence."); Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014) ("Fabrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty — i.e., his conviction and subsequent incarceration — resulted from the fabrication."). While the Massey court provided very little analysis to support its holding, the Saunders-El court noted that the only "'liberty deprivation'" in a fabricated evidence case where one is acquitted "'stems from his initial arrest.'" Id. at 561 (quoting Alexander v. McKinney, 692 F.3d 553, 557 (7th Cir. 2012)). The Saunders-El court rejected the view that "'the burden of appearing in court and attending trial, in and of itself, constitute[s] a deprivation of liberty [because] [i]t

Accordingly, we hold that an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged. In Halsey, we required a "reasonable likelihood" that a defendant would not have been convicted absent the fabricated evidence, and that standard was merely based on principles of causation. 750 F.3d at 294 n.19. The "reasonable likelihood" standard we employ simply requires that a plaintiff draw a "meaningful connection" between her particular due process injury and the use of fabricated evidence against her. See id.; see also Lamont v. New Jersey, 637 F.3d 177, 185 (3d Cir. 2011) ("Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation.").

Aside from the causation requirement, there are other hurdles facing a plaintiff alleging a due process violation for fabrication of evidence. For instance, as we cautioned in Halsey, a civil plaintiff's fabricated evidence claim should not survive summary judgment unless he can demonstrate that the fabricated evidence "was so significant that it could have affected the outcome of the criminal case." See Halsey, 750 F.3d at 295. In addition, there is a notable bar for evidence to be considered "fabricated." We have noted that "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." Id. There must be "persuasive evidence supporting a conclusion that the proponents of the evidence" are aware that evidence is incorrect or that the evidence is offered in bad faith. Id. For these reasons, we reiterate that "we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him

_____

would be anomalous to hold that attending a trial deprives a criminal defendant of liberty.'" Id. (quoting Alexander, 692 F.3d at 557 n.2). As explained in Subsection III(A) supra, however, we take a broader view of the liberty deprivations occasioned by the criminal process. Further, considering our Court's concern in Halsey and in this decision with the corruption of the truth-seeking process of trial, we disagree with Saunders-El.

with having fabricated evidence used in an earlier criminal case." Id. at 295.[13]

We conclude that Black's acquittal does not preclude her claim that the defendants intentionally fabricated evidence in violation of the due process clause of the Fourteenth Amendment. Accordingly, we will vacate and remand the District Court's dismissal of Black's fabrication of evidence claim.[14]

IV.

_____

[13] The procedural posture of this case is a motion to dismiss for failure to state a claim and we thus assume all of the facts alleged are true. The evidence may tell a different story and we express no opinion as to whether summary judgment may be appropriate at a later time.

[14] Black also asks us to vacate the dismissal of her conspiracy claims and claims under Monell. Because the District Court reasoned that Black could not succeed on her underlying Fourth Amendment malicious prosecution or Fourteenth Amendment due process claims, it correctly determined that she could not succeed on her conspiracy claims. See, e.g., Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999) ("[T]he plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim."). Similarly, the District Court correctly reasoned that the Monell claims against defendants Lower Merion Township and Montgomery County require a constitutional deprivation, but the District Court already dismissed the underlying malicious prosecution and due process claims. See, e.g., Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003) ("[F]or there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights."). Because we vacate the District Court's determination regarding both the underlying malicious prosecution and due process claims, we will vacate on the conspiracy and Monell claims as well.

For the foregoing reasons, we will vacate the District Court's order and remand for proceedings consistent with this opinion.