**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1791**

---

LEE MARVIN HARRIS, SR.,

Plaintiff - Appellant,

v.

TOWN OF SOUTHERN PINES; OFFICER JASON PERRY, Sued in his individual capacity; OFFICER SEAN LOWREY, Sued in his individual capacity; OFFICER KYLE MARSH, Sued in his individual capacity; CHIEF OF POLICE ROBERT TEMME, Sued in his official and individual capacity,

Defendants - Appellees.

------------------------------

NATIONAL POLICE ACCOUNTABILITY PROJECT,

Amicus Supporting Appellant.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:21-cv-00955-WO-JEP)

---

Argued:  May 9, 2024                      Decided:  August 5, 2024

---

Before KING, GREGORY, and RUSHING, Circuit Judges.

---

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge King joined.  Judge Rushing wrote a dissenting opinion.

---

**ARGUED:** Abraham Rubert-Schewel, TIN FULTON WALKER & OWEN, PLLC, Durham, North Carolina, for Appellant. Christian Ferlan, HALL BOOTH SMITH, P.C., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Scott D. MacLatchie, HALL BOOTH SMITH, P.C., Charlotte, North Carolina, for Appellees. Keisha James, Lauren Bonds, NATIONAL POLICE ACCOUNTABILITY PROJECT, New Orleans, Louisiana; Rob Rickner, RICKNER PLLC, New York, New York, for Amicus Curiae.

GREGORY, Circuit Judge:

While executing a search warrant at the home of Lee Marvin Harris, Sr., law enforcement officers found a trafficking amount of cocaine in an old, inoperable Cadillac that was parked in the yard. They arrested Harris, Sr. for possessing cocaine with intent to distribute. Harris, Sr. spent approximately five months in pretrial detention before federal prosecutors dismissed all charges against him, and he was released. Harris, Sr. filed suit against the Town of Southern Pines and the officers involved in his arrest for malicious prosecution in violation of the Fourth Amendment and fabrication of evidence in violation of the Fourteenth Amendment's Due Process Clause. He alleged that police officers had omitted material evidence from the prosecutors and grand juries involved in Harris, Sr.'s detention and charging decisions. The district court granted summary judgment in favor of all defendants, and Harris, Sr. appealed.

We hold that the record evinces genuine disputes of material fact bearing on whether Harris, Sr. was arrested and charged without probable cause, and that the officers are not entitled to qualified immunity for the Fourth Amendment malicious prosecution claim. We further hold that a plaintiff who was not convicted of a crime, but was arrested and detained for several months, can still state a Fourteenth Amendment fabrication of evidence claim, and the district court erred in holding otherwise. We therefore (1) reverse the district court's grant of summary judgment to Officer Jason Perry, Officer Sean Lowery, and Lieutenant Kyle Marsh in their individual capacities as to Harris, Sr.'s Fourth Amendment malicious prosecution claim, (2) vacate the district court's grant of summary judgment to the same defendants as to his Fourteenth Amendment fabrication of evidence claim, and (3) remand

3

for further proceedings consistent with this opinion.  We affirm the district court's grant of summary judgment as to the state law malicious prosecution claim, the failure to intervene claim, and the claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against the Town of Southern Pines and the Chief of Police in his official capacity.

I.

A.

Much of the context for these claims is undisputed.  Harris, Sr. lives at 803 N. Sycamore Street in Aberdeen, North Carolina, with his wife.  J.A. 194.[1]  His son, Lee Harris, Jr., lives in Charlotte, North Carolina, with his girlfriend but stays at his father's home on Sycamore Street when he is visiting the area.  *Id.*  On February 20, 2018, Southern Pines police officers obtained and executed a search warrant for 803 N. Sycamore Street.  J.A. 142.  When officers arrived at the home that day, Harris, Sr. was the only person there.  J.A. 41–42.  Officers detained him in the back of a police vehicle where Appellee Officer Jason Perry gave him a *Miranda* warning and subsequently questioned him.  J.A. 42.  While being questioned by Officer Perry, Harris, Sr. said that his son had not been home in months.  J.A. 138–39.  The officers knew from prior surveillance of the property that this was not true.  J.A. 242.

Simultaneously, Appellee Lieutenant Officer Kyle Marsh oversaw the search of a covered Cadillac parked in the yard.  Officers conducted a dog sniff search, and the K-9 alerted officers to the odor of narcotics in the vehicle.  J.A. 51.  An officer pulled away the cover from the vehicle and observed what appeared to be narcotics through the window.  *Id.*

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Lieutenant Marsh ran the license plate and confirmed that the vehicle was registered to Harris, Sr. but that the registration had expired. J.A. 68. Lieutenant Marsh opened the unlocked driver-side door and immediately recognized the smell of cocaine. J.A. 51. He located a set of digital scales, a plastic bag wrapped in layers of plastic, 88 grams of a white powdery substance later confirmed to be cocaine, and 13 grams of a white rock substance later confirmed to be cocaine base. J.A. 51–52, 208. The cocaine was packaged in the same manner as cocaine found at the house of a Hispanic man known to be Harris, Jr.'s supplier.

After this discovery, Lieutenant Marsh asked Harris, Sr. to show him where the keys to the Cadillac were. J.A. 52. Harris, Sr. took Lieutenant Marsh to his bedroom door, where the keys were hanging on a rack. *Id.* Harris, Sr. correctly described to the officers which doors on the Cadillac were locked and unlocked, that it was missing a battery, and that the trunk would not open. J.A. 139. Officers then arrested Harris, Sr. for possessing the cocaine and cocaine base found in the Cadillac.

### B.

Harris, Sr. is a disabled veteran and an ordained minister who serves as an elder at New Jerusalem Missionary Baptist Church. J.A. 115. He has filed at least one misconduct complaint against Officer Perry (which was subsequently investigated and dismissed). J.A. 258. He has also supported other community members in navigating the criminal justice system and lodging complaints against local officers. J.A. 116–17.

In February 2017, one year prior to the search of Harris, Sr.'s home, the Southern Pines Police Department began an investigation into increasing drug activity in the Southern Pines area. J.A. 125. Lieutenant Marsh oversaw the investigation (entitled "Operation

5

Leader"), and Officers Perry and Sean Lowery were the primary investigators. J.A. 124–25. The investigation identified a number of suspects operating under the name "Dope Boy Clic" or "DBC." J.A. 40. Harris, Jr. was the leader of the DBC, and Robert McRae was one of its members. J.A. 40–41. The DBC sold drugs at an abandoned house at 811 W. New York Avenue in Southern Pines, which the parties refer to as "the trap house." J.A. 41.

Investigators also discovered that Harris, Jr. used a storage locker in Aberdeen, North Carolina, to keep and sell drugs. J.A. 198. They placed GPS trackers on the two cars he used and discovered that on several occasions he drove directly from his father's home to the storage locker or the trap house, or from the storage locker or trap house directly to his father's home. J.A. 265–303. For example, on one day he drove from the storage unit to his father's house, where, according to the investigator's notes, he went "to the rear of the home, out of sight" for "approximately 2 to 3 minutes." J.A. 241, 280–81. He left the house about 15 minutes later and drove to the trap house where he engaged in a drug drop and a separate drug sale. J.A. 281.

During the investigation, officers also conducted surveillance at Harris, Sr.'s home by concealing themselves in the woods near the house. Throughout that time, they never saw Harris, Sr. near the covered Cadillac.

C.

The two relevant disputed facts concern (1) an interaction between Harris, Sr. and DBC-member McRae in front of the trap house, and (2) what officers observed while conducting in-person surveillance of Harris, Sr.'s home. As to the former, the record contains surveillance video footage of the street in front of the trap house. Officer Perry

6

viewed this footage, which is how he learned of the interaction. J.A. 41. It is undisputed that Harris, Sr.'s mother-in-law lived in the house next to the trap house. J.A. 122–23. Officer Perry testified during his deposition that he knew this to be "[h]er listed address" at the time. *Id.*

The relevant part of the record consists of three videos. The first, numbered Exhibit 15, shows Harris, Sr. exiting his truck just to the left of the trap house, having apparently just arrived, and then walking off the left side of the screen in the direction of his mother-in-law's house. The second exhibit, Exhibit 17, which is numbered as the third video but appears to be the second video chronologically based on the footage, opens with McCrae arriving in his car, towing his mobile car washing business. The ignition of Harris, Sr.'s truck then turns on and the truck drives across the screen, past the trap house, and disappears off the right side of the screen. It is followed by McRae's vehicle, which the driver turns such that it backs behind Harris, Sr.'s truck, stopping such that the front fender can barely be seen on the right side of the screen and with the mobile car washing unit presumably stopped closest to Harris, Sr.'s truck off screen. Harris, Sr. then walks across the screen on foot, coming from the left side where his mother-in-law's house is. Because his truck disappeared from view on the right side of the screen moments before Harris, Sr. appears on the left, someone else must have been driving his truck. Harris, Sr. and McRae walk from opposite directions to stand in front of the trap house for a while, eventually wandering off the right side of the screen, in the same direction in which Harris, Sr.'s truck disappeared.



Exhibit 17 at 00:58 (screenshot of video showing McRae's carwash unit backing toward

Harris, Sr.'s off-screen truck in the foreground, the tent in front of the trap house on the

right, and Harris, Sr.'s mother-in-law's property on the top left).

At the start of Exhibit 16, Harris, Sr. stands in the intersection, talking to someone in

a black Ford F-150 truck. McCrae's vehicle then drives onto the screen from the right, with

the mobile car washing unit no longer attached. McRae gets out of his vehicle, the black F-

150 drives off, and Harris, Sr. gives McRae some cash from his wallet. Finally, Harris, Sr.'s

truck backs across the screen from right to left. It reflects the sun such that it looks shiny

and very clean. Appellees characterize this as "a suspicious hand-to-hand cash transaction

at the DBC drug house with a known drug dealer," which they cite in this litigation as

supporting probable cause for his arrest. Resp. Br. at 12. Harris, Sr. contends that it is

obvious that the footage shows him paying McCrae for cleaning his car. Opening Br. at 11.

8

With respect to their in-person surveillance at Harris, Sr.'s home, the record includes the Officer's contemporaneous surveillance notes from about a month before Harris, Sr.'s home was searched. The first set of surveillance notes is from January 25, 2018. J.A. 241. The notes were written by Officer Lowry, who was watching the front of Harris Sr.'s home from "the wood line approximately 50 to 75 feet off the road." *Id.* According to the notes, Harris, Jr. arrived at the house, and briefly went inside. He then went "to the front right edge of the property" where he "plac[ed] or retriev[ed] something from underneath a tarped item located to the right of the enclosed trailer." *Id.*

Another set of notes, also written by Officer Lowery, is from January 31, 2018. J.A. 242. According to those notes, when Harris, Jr. arrived that day, he walked directly from his car to "the right side of the home, near a silver in color enclosed trailer." *Id.* He then approached "a vehicle covered with a blue tarp on it" and was "over at this vehicle approximately 2 to 3 minutes." *Id.*

The record also includes affidavits of three members of the community whom Officer Perry allegedly threatened with prosecution if they did not cooperate and provide information on suspected drug dealers. J.A. 105–06, 229–30, 261–62. Additionally, Harris, Sr. testified during his deposition that on the day his home was searched, an officer told him that Lieutenant Marsh had told the officer that if Harris, Sr. didn't "cooperate with him" about Harris, Jr., "he was gonna take [Harris, Sr.] to jail and lock [him] up." J.A. 120.

On the day Harris, Sr. was arrested, Harris, Jr. and other members of the DBC were also arrested for various trafficking related crimes. Harris, Sr. was indicted on state charges in early March 2018. Opening Br. at 22. Two weeks later, on March 19, 2018, officers

9

sent the District Attorney's Office a "prosecution summary" containing all evidence they had gathered in their investigation. *Id.*; J.A. 307. The U.S. Attorney's Office subsequently took over the prosecution, and Harris, Sr. was indicted by a federal jury on July 31, 2018. J.A. 77. The U.S. Attorney's Office filed a superseding indictment, which the grand jury handed down on September 25, 2018. J.A. 80.

Harris, Jr. subsequently pled guilty. The factual basis of his plea agreement described the following facts, concerning the same two surveillance events described in Officer Lowery's notes above:

> On or about January 25 and January 31, 2018, officers surveilled the residence of 803 Sycamore Street, Aberdeen, NC. Harris Jr.'s parents live at the Sycamore Street address, and Harris Jr. often stayed at the residence during 2017 and 2018. On both surveillance occasions, Harris Jr. arrived at the residence and then went over to a Cadillac covered with a gray car cover for a few minutes, consistent with placing and [sic] item in or retrieving an item from the vehicle. Powder cocaine and crack cocaine were later recovered from that covered Cadillac on February 20, 2018, pursuant to a search warrant.

J.A. 222. Officer Perry testified during his deposition that the only way the U.S. Attorney's office would have obtained this information about the investigation was from himself or Officer Lowery. J.A. 131. The U.S. Attorney's Office then dismissed all charges against Harris, Sr. J.A. 80. It did not explain that decision.

Harris, Sr. filed suit in December 2021 against the Town of Southern Pines and the officers. He alleged, as relevant to this appeal, malicious prosecution in violation of the Fourth Amendment and North Carolina state law and fabrication of evidence in violation of his due process rights under the Fourteenth Amendment. The district court granted summary judgment for Appellees on all claims, and Harris, Sr. appealed.

10

II.

"We review a district court's grant of summary judgment de novo." *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 342 (4th Cir. 2023).  In so doing, we view all facts and reasonable inferences in the light most favorable to the nonmoving party.  *T-Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012).  Under Federal Rule of Civil Procedure Rule 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

III.

A.

Harris, Sr. first alleges a claim under 42 U.S.C. § 1983 against the officers for malicious prosecution in violation of the Fourth Amendment.  To state such a claim, Harris, Sr. must show that (1) Appellees seized him "pursuant to legal process that was *not supported by probable cause*," and (2) "that the criminal proceedings have terminated in [his] favor."  *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) (emphasis added).  Because the claims against Harris, Sr. were dismissed, there is no question that the second element is met.  Only the first is in dispute.

"'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  "To determine whether an

11

officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Accordingly, when determining whether the officers are entitled to summary judgment, the question is not whether there is a genuine dispute of material fact about whether probable cause existed, but rather whether there is a genuine dispute of material fact about what the officers knew or reasonably believed at the time that could support a finding of probable cause. *See DeFillippo*, 443 U.S. at 37 (explaining that probable cause must be determined based on "facts and circumstances *within the officer's knowledge*" (emphasis added)). And because we construe the facts in the light most favorable to Harris, Sr., the non-movant, we must take as broad a view as the evidence will permit of what exculpatory facts the officers knew when they arrested Harris, Sr. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Because the district court did not do this—and instead improperly stepped into the jury's shoes to resolve disputed questions of fact in the officers' favor—it erred in its analysis. Specifically, the district court improperly found that based on the surveillance footage of Harris, Sr. and McRae in front of the trap house, Harris, Sr.'s "hand-to-hand cash transaction with a known drug distributor" supported the officers' reasonable belief that Harris, Sr. "was somehow involved with the drugs found." J.A. 336.

12

i.

It is heavily disputed what the officers knew based on the footage. The officers argue that handing cash to a known drug distributer in front of the trap house indicates drug-related activity. Harris, Sr. argues that there is evidence that the officers also knew that (1) his mother-in-law lived in the house next door to the trap house, (2) McRae owned a mobile car washing business, and (3) when Harris, Sr.'s car re-appeared in the footage after disappearing out of view for some time, it was notably cleaner, consistent with having just been washed. He argues that taking all inferences in his favor, based on their knowledge of these facts, the officer could not have reasonably believed his interaction with McRae constituted drug-related activity.

The additional facts Harris, Sr. cites are supported by the record, and he is correct that they create a genuine dispute of material fact as to whether the officers could have reasonably believed that this interaction supported a finding of probable cause. First, Officer Perry testified that he knew the house next to the trap house was Harris, Sr.'s mother-in-law's listed address. J.A. 122–23. It's reasonable to infer that Officer Perry knew Harris, Sr.'s mother-in-law lived there, which means that Harris, Sr. had an innocent reason for being in that neighborhood. Second, the surveillance footage shows McRae towing a mobile car washing unit behind his vehicle when he arrives, so it can easily be inferred that the officers knew that he owned a mobile car washing business and believed that Harris, Sr. was giving McRae cash in exchange for a car wash. Finally, the sequence of videos shows the following: (1) Harris, Sr.'s truck and McRae's car washing unit disappear out of view to the right of the trap house; (2) McRae's vehicle is parked such

13

that the mobile car washing unit is stopped closest to Harris, Sr.'s truck; (3) Harris, Sr. pays McRae in cash; (4) Harris, Sr.'s truck reappears and is noticeably cleaner and shinier than when it disappeared from view some time earlier.

From this footage, one could easily infer that during the time that both vehicles were out of view to the right of the trap house, McRae used the mobile car washing unit to wash Harris, Sr.'s truck, and, therefore, the payment was for that service. Because a jury could conclude that the officers, after viewing this footage, did not reasonably believe the payment and car washing service to be unrelated, the district court erred in assuming that this footage "'provides ample evidence for a reasonable law enforcement officer to believe' Plaintiff was somehow involved with the drugs found." Dist. Ct. Op. at 29 (quoting *Durham*, 690 F.3d at 190).

The inference that the officers did not reasonably believe that the video showed a drug transaction is further supported by the fact that the officers did not mention this interaction at any point prior to the filing of this suit. Neither in the warrant application to search Harris, Sr.'s home, nor in front of the magistrate who decided there was probable cause to detain Harris, Sr., nor at any time while Harris, Sr. was detained did the officers indicate that they believed he had engaged in a drug transaction. *See* Opening Br. at 10 n.2. From this, a jury could conclude that even the officers themselves did not think that the video showed a drug transaction that would have supported a finding of probable cause. Instead, the officers' silence about this interaction throughout the criminal proceedings strongly suggests that, at the time, they understood the payment for what it was: payment

14

for car washing services rendered.  In concluding otherwise, the district court improperly encroached on the jury's role as fact finder.

ii.

Of course, the district court did not base its conclusion that the officers had probable cause to arrest Harris, Sr. entirely on this surveillance footage.  Rather, the surveillance footage merely played a supporting role.  Indeed, the district court stated that "the finding of illegal contraband on Plaintiff's property alone provides probable cause for his warrantless arrest."  Dist. Ct. Op. at 26.  It likened this case to a number of our precedents, on which the government likewise relies on appeal.  But those precedents are distinguishable because their facts provide a significantly stronger basis for the inference that the contraband belonged to the defendant.  Two of the cases concerned contraband *inside* the defendant's house and thus inaccessible to the public, whereas this case concerns contraband *outside* the house that any member of the public could have accessed.[2]  *See Ker v. California*, 374 U.S. 23, 28–29 (1963) (affirming finding of probable cause as to both defendants where marijuana was found in the kitchen and bedroom of their shared apartment, though the officers had previously observed only one defendant purchase drugs

---

[2] The district court also cited *United States v. Solomon*, an unpublished case from the Middle District of North Carolina.  No. 1:11-cr-32-1, 2011 WL 1704721 (M.D.N.C. May 4, 2012).  There, too, most of the contraband was found inside the home.  *See id.* at *2.  The contraband outside the home was found in a location where Solomon had recently been observed (unlike here, where Harris, Sr. was never observed near the Cadillac).  *Id.* at *3.  And the finding of probable cause was further supported by a confidential informant's report of Solomon having "gone outside his residence to retrieve the cocaine."  *Id.*  The evidence supporting probable cause to arrest Harris, Sr. was substantially weaker.

15

from a known dealer); *Taylor v. Waters*, 81 F.3d 429, 432 (4th Cir. 1996) (finding probable cause to arrest a known drug dealer's roommate after officers found a tea pot and strainer with drug residue in the kitchen and an envelope with drug residue in the trash can of the apartment's common area). And in the third case, the arrestees were in the vehicle with the contraband. *See United States v. Myers*, 986 F.3d 453, 455 (4th Cir. 2021).[3]

Whatever may have been true if the officers had found the cocaine in Harris, Sr.'s kitchen or if Harris, Sr. had been inside the Cadillac with the drugs, these cases tell us nothing about the proposition for which the district court cited them, namely the existence of probable cause when contraband is found in the yard, outside the house. *See* Dist. Ct. Op. at 28 (stating that "contraband found *in the defendant's home* 'permits an inference of constructive possession,' even when some of the contraband was 'not in plain view'" (quoting *United States v. Shorter*, 328 F.3d 167, 172 (4th Cir. 2003)) (emphasis added). Unlike *Ker* and *Taylor*, this is not a case in which "the suspect was in close proximity to illegal drugs plainly visible *in a residence* [he] shared with a known drug dealer who used the residence as his base of operations for distribution." *Taylor*, 81 F.3d at 435 (emphasis added).

In a footnote, the district court additionally held that "the undisputed evidence is sufficient to establish Plaintiff's dominion and control of the vehicle [the Cadillac] at the

---

[3] The government states that the district court cited *Myers* only for the limited proposition that "multiple individuals' access to illegal drugs may provide 'probable cause to arrest all individuals present.'" Resp. Br. at 24 (quoting Dist. Ct. Op. at 340). That may be an accurate characterization of the district court's opinion, but it in no way bolsters the court's misplaced reliance on *Ker* and *Taylor*.

time of the search," such that the evidence supports Harris, Sr.'s constructive possession of the drugs found in the Cadillac. Dist. Ct. Op. at 28 n.4. As evidence of Harris, Sr.'s "control over the Cadillac," the district court pointed to "the Cadillac's registration in his name, Plaintiff's possession of the car key that operated the ignition, and Plaintiff's knowledge of which doors on the Cadillac were unlocked." Dist. Ct. Op. at 26–27. This is the only remotely viable theory of constructive possession contained in the district court's opinion, but neither the district court nor the government on appeal cited any case law supporting the conclusion that the cited facts are sufficient to support a finding of constructive possession.

Even assuming that the district court and government are correct that the evidence here sufficiently supports the conclusion that Harris, Sr. constructively possessed the drugs in the Cadillac, a finding of probable cause to arrest based on constructive possession additionally requires some evidence of "knowledge of the presence of the contraband." *United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021). The government argues that because (1) the Cadillac was registered to Harris, Sr., (2) the Cadillac was parked on his property, (3) he was "very familiar with the then current state and inner workings of the car," and (4) the keys were hung on his door, there is a sufficient basis to infer his knowledge of the drugs inside the car. Resp. Br. at 22–23. The government even goes so far as to say that "the car would be like the common areas of the residences in *Ker* and *Taylor*, where the plaintiffs' apparent joint possession of contraband in plain view—based on their proximity to the evidence at the base of the target suspect's drug distribution operations—was sufficient to establish probable cause." *Id.* at 23.

17

This argument proves too much and improperly assumes that knowledge of the car is always knowledge of its contents. While one can make that assumption about drugs in plain view in the defendant's kitchen, the assumption does not hold as to an out-of-view vehicle out in the yard. A car in a yard with an unlocked door that anyone walking by can open is very different from someone's kitchen. Anyone could have accessed the car without Harris, Sr. knowing and placed the drugs inside. And Harris, Sr. was never observed near the Cadillac.

Further, the drugs in the Cadillac were *not* in plain view. Even if they were plainly visible through the window of the Cadillac (which is itself disputed), the Cadillac was under a car cover, so no one could see into the Cadillac just by walking by. Drugs concealed from the public by a car cover and revealed only when officers move the car cover are decidedly *not* in plain view. *See Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (holding that when an officer moved stereo components to reveal the serial numbers on the bottom of the equipment, he conducted a "search" within the meaning of the Fourth Amendment because he "exposed to view concealed portions of the apartment or its contents"). Finally, unlike in our prior cases, there is no allegation that Harris, Jr. used his father's home as a "base" for "drug distribution operations." In fact, there is affirmative evidence that he used the trap house and storage locker for this purpose. Accordingly, there is not sufficient evidence in the record that Harris, Sr. knew of the Cadillac's contents and therefore not sufficient evidence to find probable cause.

18

iii.

Often, an indictment, "'fair upon its face,' returned by a 'properly constituted grand jury,'" is conclusive evidence that the officers had probable cause to arrest. *Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)). For that reason, a police officer will not be liable for an unlawful seizure post-indictment. *Evans v. Chalmers*, 703 F.3d 636, 648 (4th Cir. 2012) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). And Harris, Sr. was indicted by both state and federal grand juries following his arrest.

But there is an exception to this rule, namely when an officer "misled or pressured the prosecution." *Id*. at 648 (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). The question, then, is whether Appellees misled or pressured prosecutors into seeking the indictments. If not, then the jury's indictment shields the officers from liability. If so, we must rely on our own assessment of the record and disregard the indictment as conclusive of probable cause.

Harris, Sr. contends that the officers withheld exculpatory information by failing to inform prosecutors of a broad swath of information their investigation had uncovered. *See Goodwin v. Metts*, 885 F.2d 157, 164 (4th Cir. 1989) (holding that officer was liable for malicious prosecution where he failed to disclose exculpatory evidence to the prosecutor), *overruled in part on other grounds by Albright v. Oliver*, 510 U.S. 266 (1994). He says that officers did not disclose that Harris, Jr. was a known drug trafficker, that officers had observed Harris, Jr. at the Cadillac while conducting surveillance of the house, that the packaging of the cocaine found in the Cadillac was identical to the packaging of cocaine

19

found at the home of Harris, Jr.'s supplier, that the vehicle was inoperable, that it had no battery, and that the registration was expired. If prosecutors had known this information, Harris, Sr. argues, they would immediately have seen that there was no probable cause to believe the drugs were his, and thus they would not have sought an indictment. *See United States v. Di Re*, 332 U.S. 581, 594 (1948) ("Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person."); *United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir. 1993) ("Any person would have known that this was the kind of thing the judge would wish to know."). Consequently, he contends that these omissions, particularly taken together, misled prosecutors.

If the officers had made false or incomplete statements to the grand jury, we could easily conclude that the indictment does not insulate them from liability. But there is no evidence of what they testified to before the grand jury. In fact, Officer Perry testified during his deposition that he was not even sure *whether* he testified to the federal grand jury or whether it had been Officer Lowery. *See* J.A. 129.

However, the record, viewed in the light most favorable to Harris, Sr., contains evidence that the omitted evidence was not disclosed to prosecutors until after each indictment. The "prosecution summary" containing initial discovery of all information that the officers' investigation uncovered, was transmitted to the District Attorney's Office on March 19, 2018, two weeks after Harris, Sr. was indicted. *See* J.A. 307; Opening Br. at 22. And Officer Perry testified that he was "not sure the order in which information was passed along" to the U.S. Attorney's Office, such that it was "possible" that the prosecution summary

20

was not passed along until after the federal indictment. J.A. 128. Thus, viewed in the light most favorable to Harris, Sr., officers did in fact withhold the evidence from prosecutors, such that the indictment cannot protect them from liability if that evidence was material.

For the reasons explained above, the breadth of undisclosed exculpatory information was material to the finding of probable cause. First, the finding of probable cause based solely on the officers' discovery of cocaine in the Cadillac was tenuous to begin with. But that finding would have been undermined by the evidence that Harris, Jr. was seen at the Cadillac, that he was a known drug dealer, and that the packaging of the drugs matched packaging of cocaine found at the home of Harris, Jr.'s supplier. Because the exculpatory evidence that officers withheld was material to the finding of probable cause, the officers' omissions misled prosecutors such that Harris, Sr.'s subsequent indictment cannot protect them from liability. Accordingly, the district court erred in concluding that there was probable cause to arrest Harris, Sr.

### iv.

The district court also held that, even if there was no probable cause to arrest Harris, Sr., the officers are still entitled to summary judgment because they are protected by qualified immunity. Here, too, the district court erred. It stated that, "[i]n light of the cases described herein, finding probable cause to arrest upon discovery of illegal contraband in a home or a vehicle, a reasonable law enforcement officer would not have understood that arresting Plaintiff upon finding narcotics on his property violated a clearly established constitutional right." Dist. Ct. Op. at 38 n.7. But, as explained above, those cases are not remotely applicable. And it defies common sense to say that an officer is

21

entitled to qualified immunity when the allegedly unconstitutional conduct is deliberately withholding exculpatory evidence from prosecutors until after a suspect is indicted. No "reasonable officer" would have believed that he could constitutionally mislead and deceive prosecutors in this manner. As we have previously explained, "although we must avoid ambushing government officials with liability for good-faith mistakes made at the unsettled peripheries of the law, we need not–and should not–assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019).

Further, even if that alone were not enough, we previously held in *Goodwin v. Metts* that officers are liable for malicious prosecution if they deliberately withhold exculpatory information from prosecutors. 885 F.2d at 164.[4] Thus, because it was clearly established that officers cannot mislead prosecutors about the viability of charges by withholding exculpatory information until after the suspect was indicted, the officers are not entitled to qualified immunity. The district court erred in granting summary judgment to Officer Perry,

---

[4] Admittedly, in *Goodwin*, we treated the malicious prosecution claim as a due process violation, rather than a claim under the Fourth Amendment. 885 F.2d at 163. And in *Albright v. Oliver*, the Supreme Court held that "it is the Fourth Amendment, and not substantive due process," under which claims of prosecution without probable cause arise. 510 U.S. 266, 271 (1994). But merely situating the same claim under a different constitutional provision did not undermine *Goodwin*'s holding that an officer who withholds exculpatory information from a prosecutor violates a defendant's constitutional rights.

Officer Lowery, and Lieutenant Marsh on the Fourth Amendment malicious prosecution claim.[5]  Accordingly, we reverse the district court's decision as to that claim.

B.

Harris, Sr.'s second claim alleges that officers caused the wrongful initiation of criminal proceedings against him by fabricating evidence in violation of his rights under the Fourteenth Amendment's Due Process Clause.[6]  The district court held that "Plaintiff's due process fabrication of evidence claim fails because the charges against Plaintiff were dismissed and the alleged loss of liberty was pretrial detention."  Dist. Ct. Op. at 40.  It stated that "[c]ourts consider claims concerning unlawful pretrial detention as arising under the Fourth Amendment," and therefore, because "a fabrication of evidence claim is

---

[5] This claim is somewhat weaker against Lieutenant Marsh.  While Officer Perry appears to have testified in front of both the state and federal grand juries, J.A. 129, 248, and thus must have been in contact with prosecutors to whom he failed to disclose the relevant information, and Officer Lowery is the one who signed and submitted the prosecution summary and is listed thereon as the "Charging Officer," J.A. 307, it is not clear that Lieutenant Marsh had any involvement in the case after the search warrant was executed.  However, presumably prosecutors would have spoken to him at some point prior to deciding to indict Harris, Sr. because he was Perry and Lowery's supervising officer, and he was the one who actually found the contraband.  J.A. 50–51.  He knew of all the exculpatory evidence, as his affidavit clearly indicates, but he too did not tell prosecutors.  J.A. 53.  Accordingly, this claim should proceed to trial against all three officers.

[6] To succeed on a Fourteenth Amendment fabrication of evidence claim, a plaintiff must show that (1) that officers fabricated or omitted material evidence; (2) that he suffered a loss of liberty; and (3) that the loss of liberty was caused by the fabricated evidence.  *See Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) ("Fabrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty . . . resulted from the fabrication.").

23

properly understood as arising under the Fourteenth Amendment's due process clause," the officers were entitled to summary judgment on that claim.[7]  *Id.* at 40–41.

In so holding, the district court misidentified the alleged harm.  In a Fourth Amendment claim, the alleged harm is the plaintiff's wrongful detention without probable cause.  *See* U.S. Const. amend. IV ("The right of the people to be secure . . . against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.").  And for that reason, if there is probable cause to detain the plaintiff, any claim under the Fourth Amendment fails.  *See Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (stating that one element of a Fourth Amendment malicious prosecution claim is that the plaintiff's seizure "was not supported by probable cause").

But in a due process fabrication of evidence claim, the alleged harm is that the entire panoply of rights afforded to criminal defendants was infected by the fabricated evidence,

---

[7] The dissent accuses us of "thrust[ing] upon Harris a Fourteenth Amendment due process claim he does not make."  *See* Dissent Op. at 37.  This is baffling.  In his Opening Brief, Harris, Sr. states that the officers "fabricated evidence which caused Plaintiffs' wrongful pre-trial detention. . . . [N]umerous other Circuit Courts of Appeal have recognized such a claim under the Fourth *and Fourteenth* Amendments."  Opening Br. at 39 (emphasis omitted) (emphasis added).  And though Harris, Sr. references a claim under "the Fourth and Fourteenth Amendments," our sister circuits have been abundantly clear that a fabrication of evidence claim arises under the Fourteenth Amendment, not the Fourth.  *See, e.g.*, *Spencer v. Peters*, 857 F.3d 789, 783 (9th Cir. 2017) ("The *Fourteenth Amendment* prohibits the deliberate fabrication of evidence by a state official." (emphasis added)); *Black v. Montgomery County*, 835 F.3d 385, 368 (3d Cir. 2016) (turning to the plaintiff's "*Fourteenth Amendment* due process claim for fabrication of evidence" (emphasis added)).  The district court likewise understood Harris, Sr. to be making a Fourteenth Amendment claim, though it erroneously concluded that such a claim was not viable in Harris, Sr.'s case.  *See* Dist. Ct. Op. at 39–40 (discussing Harris, Sr.'s "due process fabrication of evidence claim").  We thus cannot reconcile the record with the dissent's assertion that Harris, Sr. made no Fourteenth Amendment claim.

24

thus wrongfully depriving the defendant of their liberty.  For example, "[t]he setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, *which in turn may be critically influenced by fabricated evidence*."[8]  *Garnet v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016).  For that reason, several of our sister circuits have held that even if probable cause exists in the absence of the fabricated evidence, that is no defense to a due process claim.  *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ashley v. City of New York*, 992 F.3d 128, 138 (2d Cir. 2021); *Spencer v. Peters*, 857 F.3d 789, 801–02 (9th Cir. 2017); *Black v. Montgomery County*, 835 F.3d 358, 369 (3d Cir. 2016); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).  A criminal defendant's rights attach as soon as criminal proceedings begin, whether or not the plaintiff is subsequently convicted and whether or not the proceedings are supported by probable cause.  Accordingly, the alleged harm in a due process fabrication of evidence case is the "wrongful initiation of prosecution."  *Black*, 835 F.3d at 370; *see id.* at 371 ("[W]e hold that an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged.").  Whether the defendant

---

[8] In fact, that is exactly what transpired here.  Harris, Sr.'s bail was originally set at $500,000.  Because he could not afford to pay it, he remained in jail.

25

is detained pre-trial or not, he experiences a deprivation of liberty when criminal proceedings against him are initiated.

Several other circuits have allowed due process fabrication of evidence claims to proceed where the plaintiffs were never convicted, as is true here. *See Ricciuti*, 124 F.3d at 127; *Ashley*, 992 F.3d at 131; *Black*, 835 F.3d at 369; *see also Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015); *Weiland v. Palm Beach Cnty. Sherriff's Off.*, 792 F.3d 1313 (11th Cir. 2015). We have never expressly held, one way or the other, whether fabrication of evidence claims are available to plaintiffs who were never convicted.[9] However, the Second Circuit, for example, has expressly stated that the plaintiff "need not have been tried" (let alone convicted) "to make out this claim so long as some deprivation of liberty occurred." *Ashley*, 992 F.3d at 138. Or, as the Third Circuit has explained, "There is no meaningful reason why due process protections precluding fabricated evidence should turn on whether or not one is convicted at trial." *Black*, 835 F.3d at 370.

The district court cited two Supreme Court cases for the proposition that unlawful pretrial detention claims properly arise solely under the Fourth Amendment. Dist. Ct. Op. at 40 (citing *Albright v. Oliver*, 510 U.S. 266, 273–74 (1994); *Manuel v. City of Joliet*, 580 U.S. 357, 365–67 (2017)). These cases are inapposite, and none of our sister circuits has

---

[9] The district court pointed to two cases in which we stated that the relevant "loss of liberty" with respect to the fabrication claims in those cases was the plaintiff's conviction. Dist. Ct. Op. at 40–41 (quoting *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014); *Washington v. Wilmore*, 407 F.3d 274, 282–83 (4th Cir. 2005)). But those cases merely said that a conviction is a sufficient loss of liberty to state a fabrication claim; not that a conviction is necessary.

held that either of these cases precludes a fabrication of evidence claim where the defendant was detained pretrial but not convicted.

In *Albright v. Oliver*, the Supreme Court addressed whether the Fourth or Fourteenth Amendment provides the right "to be free of prosecution without probable cause." 510 U.S. at 271. A plurality of the Court held that that claim (a malicious prosecution claim) properly arose under the Fourth Amendment on the basis that the due process clause provided no entitlement to "oversight or review of the decision to prosecute." *Id.* at 274 (internal quotation omitted). But, unlike with respect to his Fourth Amendment malicious prosecution claim and unlike the plaintiff in *Albright*, Harris, Sr.'s alleged harm with respect to this claim is the lack of probable cause. Rather, "the harm of the fabrication is corrupting" the criminal process "regardless . . . of the time in the proceeding that the corruption occurs." *Black*, 835 F.3d at 371. If the initiation of criminal proceedings rests on fabricated evidence, that harm has occurred. It does not matter whether the defendant is subsequently detained or whether there is probable cause; if the officers fabricate evidence, the harm has been done. *Albright* had no reason to consider whether the plaintiff could maintain a fabrication of evidence due process claim because *Albright* concerned malicious prosecution claims based on a lack of probable cause not fabrication of evidence claims.

The same is true of *Manuel v. City of Joliet*, though the plaintiff there was detained pretrial. *Manuel*, 580 U.S. at 359. But the question before the Court was not whether he could bring a claim for fabrication of evidence under the Fourteenth Amendment, because he had not brought any such claim. Instead, he had brought his claim solely under the

27

Fourth Amendment for detention without probable cause. *Id.* at 363. The Supreme Court held that that claim remained viable even though his detention continued after a judicial probable-cause determination had been made. *Id.* at 367. That holding says nothing about whether the plaintiff could have maintained a due process claim for fabrication of evidence.

The dissent argues that Harris, Sr.'s fabrication of evidence claim fails because he was detained pretrial. It reasons that the only way to challenge one's pretrial detention is through a Fourth Amendment claim. *See* Dissent Op. at 36–38. We have already explained that the relevant harm for Harris, Sr.'s fabrication of evidence claim is the initiation of criminal proceedings against him (*i.e.*, his indictment), and not his detention. And it would defy common sense if a plaintiff who is indicted and released on bail but whose indictment is subsequently dismissed could maintain a due process fabrication of evidence claim while a plaintiff who is indicted and detained before his indictment is dismissed could not.

Because the district court believed that this sort of claim was precluded, it did not go on to consider whether there was evidence of fabrication. Dist. Ct. Op. at 42. "[W]e are a court of review, not first view." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020); *see Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 142 (4th Cir. 2018) ("Ordinarily, 'a federal appellate court does not consider an issue not passed upon below.'" (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976))). Accordingly, we will not address, in the first instance, whether there is a genuine dispute of material fact as to the fabrication claim and whether officers are entitled to qualified immunity on this claim. Instead, we vacate the district court's grant of summary judgment on the Fourteenth

28

Amendment fabrication of evidence claim and remand for further proceedings consistent with this opinion.

## C.

Harris, Sr. also argues that the district court improperly granted summary judgment on his state law malicious prosecution claim. Harris, Sr.'s argument is essentially that this claim is coextensive with the Fourth Amendment malicious prosecution claim and that the district court erred in granting summary judgment to the officers for the same reasons. *See* Opening Br. at 41–42. But the district court held in the alternative that "Plaintiff's claim under state law is barred by public official immunity." Dist. Ct. Op. at 38 n.7. Harris, Sr.'s Opening Brief does not even mention public official immunity, let alone attempt to address why this holding is incorrect. Likewise, Harris, Sr.'s brief does not address the district court's grant of summary judgment on his failure to intervene and *Monell* claims. "A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up). Accordingly, we affirm the district court's grant of summary judgment on the state law malicious prosecution claim, failure to intervene claim, and *Monell* claim on the basis that Harris, Sr. has waived any argument that the district court erred with respect to these claims.

## IV.

In their effort to prosecute Harris, Sr., Officer Perry, Officer Lowery, and Lieutenant Marsh omitted material exculpatory evidence from prosecutors and the two

29

grand juries that subsequently indicted Harris, Sr. Accordingly, we reverse the district court's grant of summary judgment to Officer Perry, Officer Lowery, and Lieutenant Marsh in their individual capacities as to Harris, Sr.'s Fourth Amendment malicious prosecution claim. The record, viewed in the light most favorable to Harris, Sr., creates a genuine dispute of material fact as to whether Harris, Sr. was arrested and charged without probable cause. Further, the officers are not entitled to qualified immunity on that claim. We vacate and remand the district court's grant of summary judgment on Harris, Sr.'s Fourteenth Amendment fabrication of evidence claim because the district court erroneously held that a plaintiff can assert such a claim only with respect to a crime for which he has been convicted. Finally, we affirm the district court's grant of summary judgment as to the state law malicious prosecution claim, the failure to intervene claim, and the *Monell* claim against the Town of Southern Pines and the Chief of Police in his official capacity. Harris, Sr. failed in his Opening Brief to raise any argument that the district court erred with respect to these claims and has thus waived those arguments.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*

30

RUSHING, Circuit Judge, dissenting:

I would affirm in full the district court's order granting summary judgment for the defendants. The defendant police officers had probable cause to arrest plaintiff Lee Marvin Harris, Sr. for drug crimes. And probable cause defeats Harris's malicious prosecution and fabrication of evidence claims, which are both based in the Fourth Amendment.

I.

Harris sued the officers under 42 U.S.C. § 1983 for violating the Constitution's Fourth Amendment by malicious prosecution. To prove such a claim, a plaintiff must show that "'the defendant . . . seized plaintiff pursuant to legal process that was not supported by probable cause'" and "'the criminal proceedings . . . terminated in plaintiff's favor.'" *Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014) (quoting *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)); *see also Thompson v. Clark*, 142 S. Ct. 1332, 1337–1338 (2022).

If the defendant acted with probable cause, then a malicious prosecution claim cannot succeed. *Chiaverini v. City of Napoleon*, 144 S. Ct. 1745, 1748 (2024). Probable cause exists when "'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). It is a "practical, common-sense judgment" based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 244 (1983); *see also Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause . . . is not a high bar.").

31

The officers had probable cause to arrest Harris for drug crimes after they searched his property on February 20.[1]  The officers found 88 grams of powder cocaine, 13 grams of crack cocaine, empty packaging for a kilogram brick of cocaine, and digital scales in his Cadillac, which was parked in his yard, to the side of his residence.  The drugs were visible through the Cadillac's windows when the car cover over the vehicle was lifted.  The Cadillac was registered to Harris, although the registration was expired.  Harris kept the Cadillac's keys hanging on his bedroom door and gave them to the officers during their search.  He was well acquainted with the car's current condition: he accurately advised the officers which doors on the Cadillac were locked and which ones were unlocked, that there was no battery in the car, and that the trunk would not open.  Harris's son—a suspected leader of a local drug distribution ring—had visited Harris's home almost daily over the past month, including overnight stays, and had recently been observed speaking with Harris in the front yard.  Yet Harris told the officers that his son hadn't been to his home in months.  He also told the officers that his son had not brought anything to his property.

These facts would warrant a reasonable officer in believing that Harris had committed crimes of drug possession and trafficking.  The digital scale and volume of cocaine suggested trafficking.  *See*, *e.g.*, *United States v. Bell*, 901 F.3d 455, 460–461 (4th Cir. 2018) (digital scales are "evidence of drug trafficking"); N.C. Gen. Stat. § 90-95(h)(3)

---

[1] The Supreme Court recently clarified that "courts should evaluate [malicious prosecution] suits . . . charge by charge." *Chiaverini*, 144 S. Ct. at 1750.  Harris was arrested for trafficking cocaine, maintaining a vehicle to keep cocaine, possessing drug paraphernalia, and possessing cocaine with intent to distribute.  His arguments about probable cause do not distinguish among these charges.

(possessing 28 grams of cocaine is trafficking in North Carolina). The drugs were found on Harris's property in a car he owned and stored there. *See United States v. Herder*, 594 F.3d 352, 358 (4th Cir. 2010) ("A person may have constructive possession of contraband if he has ownership, dominion, or control over the contraband or the premises or vehicle in which the contraband was concealed."). The facts and circumstances demonstrated that Harris not only possessed the Cadillac but also exercised control over it and was knowledgeable about its current condition. And the officers knew Harris was lying to them about whether his son had visited the property. Further, Harris's assertion that his son hadn't brought anything to the property suggested that either the drugs belonged to Harris or he knew his son had stored contraband on the property and was lying to the officers about that as well. *See id.* ("[K]nowledge of the presence of the contraband . . . may be established by either circumstantial or direct evidence." (internal quotation marks omitted)).

The additional facts Harris emphasizes on appeal do not negate the officers' probable cause to arrest him. Harris stresses that, during surveillance three to four weeks before the search, officers twice saw his son stand near the Cadillac "for a few minutes, consistent with placing an[] item in or retrieving an item from the vehicle." Opening Br. 24 (internal quotation marks omitted). He also notes that cocaine in the Cadillac was packaged the same way as narcotics from his son's supplier. Considering this information along with the other facts known to the officers, they still had probable cause to believe Harris knowingly possessed the cocaine and digital scale in the Cadillac. Possession can be joint, and his son's potential involvement with the drugs did not prove Harris's

33

innocence. *See United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021) ("Possession may be actual or constructive, and it may be sole or joint." (internal quotation marks and brackets omitted)).   Nor do these facts counter the reasonable inference that Harris conspired with his son to possess and distribute cocaine.[2]  The totality of the circumstances therefore demonstrates the officers had probable cause to arrest Harris for crimes of drug possession and trafficking.

Furthermore, both a state grand jury and a federal grand jury indicted Harris for drug crimes, which "conclusively establish[es]" the existence of probable cause. *Durham*, 690 F.3d at 189.  Although "a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information that influenced the decision," here there is no evidence of what any officer testified to before the grand jury, and it appears some officers did not testify at all. *Id.* (internal quotation marks, ellipsis, and brackets omitted). For this additional reason, the district court was correct to grant the officers summary judgment on Harris's Fourth Amendment malicious prosecution claim.

Even setting aside the actual existence of probable cause, the officers were entitled to qualified immunity because, as the district court held in the alternative, the law did not clearly establish that they lacked probable cause to arrest Harris after finding a substantial quantity of cocaine on his property. *See District of Columbia v. Wesby*, 583 U.S. 48, 63

---

[2] Harris and the majority also discuss a scene in front of the trap house which the officers interpret as a hand-to-hand cash transaction between Harris and a known drug dealer but which Harris contends was payment for a car wash.  That incident is not necessary to a finding of probable cause, so Harris's explanation does not undercut the officers' probable cause to arrest him.

(2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  The majority ignores this pertinent question[3] and diverts attention to a case about officers "deliberately withhold[ing] exculpatory information from prosecutors."  Maj. Op. 22.  But the majority does not cite a shred of evidence to suggest any of the defendants withheld exculpatory information from the state or federal prosecutors here.  The majority relies solely on (1) a form showing that, two weeks after the state indictment, the charging officer delivered the entire investigative file regarding Harris and his codefendants to the state prosecutor, and (2) a different officer's testimony that he wasn't sure the order in which federal prosecutors were provided information.  *See* Maj. Op. 20–22.  To state the obvious, this evidence says nothing about what information *was* disclosed to prosecutors before the indictments or whether any *exculpatory* information was withheld until after indictment.  Rank speculation does not suffice at summary judgment.  *See Smith v. Schlage Lock Co.*, 986 F.3d 482, 486 (4th Cir. 2021) ("[U]nsupported speculation is not sufficient to defeat a summary judgment motion." (internal quotation marks omitted)).

---

[3] After discussing the relevant caselaw earlier in its opinion, the majority concludes that "these cases tell us nothing about . . . the existence of probable cause when contraband is found in the yard, outside the house."  Maj. Op. 16.  One would think that the absence of instructive precedent would mean the officers are entitled to qualified immunity.  After all, "[t]o be clearly established, a legal principle . . . must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63 (internal quotation marks and citations omitted).

35

In brief, the district court correctly granted summary judgment for the officers on Harris's Fourth Amendment malicious prosecution claim because the officers acted with probable cause when they arrested him. The state and federal indictments against Harris separately confirm the existence of probable cause. And, at the very least, the officers were entitled to qualified immunity because the absence of probable cause was not clearly established.

## II.

Harris also sued the officers under 42 U.S.C. § 1983 for "fabricat[ing] evidence which caused [his] wrongful *pre-trial detention*." Opening Br. 39. The alleged fabrications are the same as those in his malicious prosecution claim: Harris contends the officers withheld "from the state and federal decision makers" that (1) they twice observed his son stand near the Cadillac consistent with placing or retrieving an item, (2) the Cadillac's registration was inactive, (3) some cocaine packaging in the Cadillac matched packaging used by his son's supplier, and (4) the Cadillac's keys hung on the outside of Harris's bedroom door. Opening Br. 40. Relying on *Manuel v. City of Joliet*, Harris argues that "'[l]egal process did not expunge [his] Fourth Amendment claim'" based on fabricated evidence because "'the process he received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime.'" Opening Br. 39 (quoting *Manuel*, 137 S. Ct. 911, 919–920 (2017)).

Harris is correct that the Fourth Amendment governs this claim because "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process." *Manuel*, 137 S. Ct. at 920. The Supreme Court "decided some four decades ago

36

that a claim challenging pretrial detention fell within the scope of the Fourth Amendment." *Id.* at 917 (citing *Gerstein v. Pugh*, 420 U.S. 103, 125 & n.27 (1975)).  And in *Manuel*, the Court clarified that "[i]f the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."  *Id.* at 919.  That includes claims, as in *Manuel*, that police officers fabricated evidence on which a decisionmaker relied to find probable cause supporting further pretrial detention.  *See id.* at 915; *see also Massey*, 759 F.3d at 356 (explaining that a claim focused on "fabricated evidence's role in securing [the plaintiff's] arrest and continuing his prosecution" is "properly founded on [the] Fourth Amendment" (internal quotation marks omitted)).  That is precisely the claim Harris brings here.

The majority, however, thrusts upon Harris a Fourteenth Amendment due process claim he does not make.[4]  After raising this argument for Harris, the majority concludes that his claim arises not under the Fourth Amendment as he contends but under the Due Process Clause of the Fourteenth Amendment.  *See* Maj. Op. 23–28.  Respectfully, that

---

[4] I have already quoted Harris's brief where he explains he is bringing a "Fourth Amendment claim" about "wrongful *pre-trial detention*," "the same claim" as "in *Manuel*." Opening Br. 39; *see supra*, at 36.  But the majority remains "baffl[ed]" at the assertion that Harris no longer pursues a due process claim, so I will explain even further.  Maj. Op. 24 n.7.  The phrase "due process" does not occur anywhere in Harris's opening or reply briefs. His one reference to the Fourteenth Amendment is in a sentence describing "the brief filed by *amicus curiae*."  Opening Br. 39.  But Harris himself couldn't be clearer:  he "makes the same claim" as *Manuel*: that "'[l]egal process did not expunge [his] Fourth Amendment claim because the process he received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime.'" Opening Br. 39 (quoting *Manuel*, 137 S. Ct. at 919–920); *see id.* (Harris asserting that he seeks "relief for 'his (post-legal-process) pretrial detention' based on fabricated evidence" (quoting *Manuel*, 137 S. Ct. at 919)).

contravenes *Manuel*, where the Supreme Court chastised the lower court for "convert[ing]" the plaintiff's Fourth Amendment claim about pretrial detention "into one founded on the Due Process Clause." 137 S. Ct. at 919. It also ignores that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and . . . always has been thought to define the 'process that is due' for . . . the detention of suspects pending trial." *Gerstein*, 420 U.S. at 125 n.27; *see also Massey*, 759 F.3d at 354–357 (distinguishing between a claim about fabrication of evidence at trial to obtain a conviction, which implicates the Due Process Clause, and fabrication of evidence pretrial to secure arrest and indictment, which implicates the Fourth Amendment). Because Harris's fabrication claim is premised on pretrial detention without probable cause, he rightly invokes the Fourth Amendment.

A Fourth Amendment fabrication of evidence claim requires that "the false statements or omissions must be material, that is, necessary to the finding of probable cause." *Massey*, 759 F.3d at 357 (internal quotation marks omitted). Materiality is determined by "excising the offending inaccuracies," taking into account the alleged omissions, "and then assessing whether the corrected evidence . . . would establish probable cause." *Id.* (internal quotation marks and brackets omitted).

As previously explained with respect to Harris's malicious prosecution claim, the totality of the circumstances known to the officers, including all the facts Harris alleges the officers failed to disclose, were sufficient to warrant the officers, the magistrate, and the state and federal grand juries in finding it probable that Harris had committed the drug offenses with which he was charged. Because the supposed fabrications were not material

38

to the finding of probable cause, Harris's Fourth Amendment fabrication of evidence claim fails.

*    *    *

Harris's malicious prosecution and fabrication of evidence claims are both based in the Fourth Amendment and defeated by the existence of probable cause. Because the majority concludes otherwise, I respectfully dissent.